**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| ONE LOVE HOUSING, LLC, TIMOTHY McNELLIS, and BRANDON SEVERSON, | Civil No. 19-1252 (JRT/DTS) |
| Plaintiffs, | |
| v. | **MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| CITY OF ANOKA, | |
| Defendant. | |

Fabian S. Hoffner, **THE HOFFNER FIRM LTD**, 310 Fourth Ave South, Suite 5010, Minneapolis, MN 55402; Scott A. Benson, **BRIOL & BENSON PLLC**, 80 South Eighth Street, Suite 3700, Minneapolis, MN 55402; Steven G. Polin, **LAW OFFICES OF STEVEN G. POLIN**, 3034 Tennyson Street Northwest, Washington, DC 20015, for plaintiffs.

Jessica E. Schwie and Michelle A. Christy, **KENNEDY & GRAVEN CHTD,** 150 South Fifth Street, Suite 700, Minneapolis, MN 55402, for defendant.

One Love Housing, LLC ("One Love") submitted a reasonable accommodation request to the City Council (the "Council") of the City of Anoka (the "City"), asking to house seven individuals in its single-family dwelling instead of the four allowed under the City Code. When making this request, One Love argued that having seven residents is necessary to realize a beneficial therapeutic environment for its residents, who are recovering from alcoholism or chemical dependence, and to maintain the financial viability of the dwelling as a sober house. The Council denied One Love's request.

Plaintiffs—One Love, the sober house's live-in manager, and a resident—allege that the City violated the Fair Housing Act ("FHA") and the Americans with Disabilities Act ("ADA") when denying One Love's reasonable accommodation request.  Both parties now move for summary judgment.  Because the record demonstrates that One Love has met its burden to show that its request is both reasonable and necessary to afford its residents an equal opportunity to use and enjoy the dwelling, and that the City has failed to show that the requested accommodation will impose an undue burden upon it or fundamentally alter its zoning scheme, the Court will grant One Love's Motion for Summary Judgment and deny the City's Motion.

## BACKGROUND

### I.    FACTUAL BACKGROUND

#### A.    Historical Backdrop

In the early 2000s, there were several businesses in the City renting beds to individuals recovering from alcoholism or chemical dependence.  (Decl. Jessica E. Schwie ("Schwie Decl.") ¶ 2, Ex. D ("Rice Dep.") at 12:21–13:16, Jan. 29, 2021, Docket No. 57-2.)  When Phillip Rice (now Mayor) ran for a council seat in 2004, forefront on his mind was to create a rental licensing ordinance to help regulate such businesses.  (Rice Dep. at 10:21–22, 13:17–14:20.)

After 2004, an ordinance went into effect to limit the number of unrelated persons living together in a single-family dwelling to four.  (*Id.* at 37:18–21.)  Because of the four-

person limit, seven sober houses in the City were forced to close, which Councilmember Mark Freeburg stated was one of the Council's goals. (*Id.* at 62:3–12; Schwie Decl. ¶ 2, Ex. G ("Freeburg Dep.") at 55:25–56:13, Jan. 29, 2021, Docket No. 57-2.) After another ordinance went into effect in 2006, one regarding rental licensure, the number of sober houses dropped from eleven to four. (Rice Dep. at 66:14–67:18.) In 2008, yet another ordinance was discussed, one specifically related to sober house licensing, and the Council was advised that they would be sued if they approved it. (Freeburg Dep. at 59:13–20.) A sober house licensing ordinance was passed on May 5, 2008. (Schwie Decl. ¶ 2, Ex. K ("Baumgartner Dep.") at 13:1–9, Jan. 29, 2021, Docket No. 57-2.)

### B.    One Love Inquires About a Reasonable Accommodation

One Love's dwelling at 328 Washington Street is licensed as a sober house limited to a single family. (Land Use Record ("LUR") at 46, 74, Docket No. 24-1.[1]) Under the City Code, this means that not more than four unrelated people can live there as a "family." (*See id.* at 1131, Docket No. 24-2.) On March 15, 2018, One Love's counsel wrote to the City to inquire about a reasonable accommodation to increase the number of residents at the dwelling. (*Id.* at 45, Docket No. 24-1.)

One Love's counsel followed up on March 27, 2018, attaching a letter to assist the City Attorney, Scott Baumgartner, in evaluating the request. (*Id.* at 25.) The seven-page

---

[1] When citing to the Land Use Record, the Court will paginate according to the bates number and provide the corresponding docket number.

letter extensively laid out case law interpreting reasonable accommodation requests by individuals in recovery to increase the number of their "family." (*See generally id.* at 33–39.) The letter also stated that:

> This household functions as the equivalent of a family . . . and allows the recovering persons to provide one another with continual mutual support, as well as mutual monitoring to prevent relapse . . . Further, it is often critical that a person in the early and middle stages of recovery shares a bedroom with another recovering addict for mutual support and monitoring . . . [The support and bonding given each resident] is the equivalent of the type of love and support received in a traditional family . . . Persons recovering from addiction are far more often successful when living in a household with at least eight other persons in recovery, particularly in the early stages of recovery. Barring more than three unrelated individuals from residing together, without regard to the size of the residential unit, interferes with the critical mass of individuals supporting each other in recovery.

(*Id.* at 33–36.) Along with the letter, One Love's counsel sent a proposed reasonable accommodation request, which stated that increasing the number of residents from four to seven in One Love's sober house was necessary to provide a strong support group in a residential community. (*Id.* at 53–54.)

On April 26, 2018, the City's Community Development Director, Douglas Borglund, emailed the Council, stating that the "City Attorney and City Staff have reviewed [One Love's] request, researched the issue, and have determined it will be very difficult to challenge this request[,]" especially as people in recovery "are considered [to have] a disability under the [FHA] and are a protected class." (*Id.* at 75.) Borglund also

recommended that the Council develop a procedure to process reasonable accommodation requests with respect to sober houses, (*id.* at 75–76,) and attached One Love's letter and proposed reasonable accommodation request, as well as Joint Statements by the Department of Justice ("DOJ") and the Department of Housing and Urban Development ("HUD") regarding reasonable accommodation requests made pursuant to the FHA, (*id.* at 77–129.)

### C.    Establishing a Procedure for Reasonable Accommodation Requests

#### 1.    May Meeting: Special Work Session

The Council held a special work session on May 7, 2018.   (*Id.* at 218.) Councilmember Freeburg began by asking whether one had to be a "drunk" to be a resident, or "a drunk trying to quit[.]"   (*Id.* at 220 (11:22–24, 12:4–5).)  He then added that "I sold a house to a single lady across the street from this place about six or eight months ago.   Now seven unemployed drunks are going to be living across the street from her." (*Id.* at 221 (13:13–17).)  Mayor Rice stated that he "would love to challenge [One Love's request] somehow."   (*Id.* (14:16).)  City Attorney Baumgartner responded that One Love would rely on case law and call experts to testify that having "a larger support network of like-minded sober individuals in the same household is more therapeutic for recovery than . . . four . . . and it would be very difficult to challenge what an expert would say[.]" (*Id.* (15:8–24).)  Councilmember Jefferson Weaver opined that the residents are "probably on disability" and stated, in reference to the owner of One Love, "[a]re we going to let

him bring something wrong into the main part of town too?"  (*Id.* at 221, 223 (16:18–19, 21:3–5).)

Attention then turned to whether a spacing requirement between sober houses could be imposed.  (*Id.* at 223 (21:8–18).)  Weaver liked the idea of having a quarter mile buffer requirement.  (*Id.* (21:19–20).)  Councilmember Brian Wesp wondered whether a sober house's proximity to a school could be considered.  (*Id.* (23:10–14).).  Baumgartner stated that with a "predatory offender . . . at least there you've got a decent argument . . . [but this] is a little different."  (*Id.* (24:4–9).)

Freeburg then asked, "if we decide not to allow or approve this and go to court, will we lose?"  (*Id.* at 224 (25:11–13).)  Baumgartner said, that in his opinion, the answer was yes, especially based upon the strong language in the Joint Statements from DOJ and HUD.  (*Id.* (25:14–27:1).)  Baumgartner added that he tried "to find a way around" the FHA, but could not.  (*Id.* (27:4–6).)  Freeburg lamented that sober house owners could "devalue neighboring houses."  (*Id.* (27:7–20).)  Weaver agreed that granting reasonable accommodation requests would change the character of the community.  (*Id.* (27:21–28:3).)

Baumgartner, playing devil's advocate, said, "Let me turn it . . . What about a family of mom, dad, grandparents are living there, and six kids in the house[?]"  (*Id.* 28:4–7).)  When Weaver replied, "They got blood," (*id.* (28:8)), Baumgartner said, "How are you going to show, without discriminating against this group, that blood makes a difference?"

(*Id.* (28:9–11).)  Rice: "Family.  That's what the law says."  (*Id.* (28:13–14).)  Freeburg: "Seven guys? They're acting as a family?"  (*Id.* (28:15–16).)  Baumgartner: "[W]hile I don't disagree, in order to challenge that, I don't know how you can challenge that without discriminating against that other group simply based upon blood, unless you've got something more showing that that group absolutely should not be a family because of X, whatever X is."  (*Id.* at 224–25 (28:23–29:4).)

Freeburg stated that he was "in favor of playing hard ball," as was Weaver.  (*Id.* at 225 (30:2–5).)  Rice suggested requiring residents to pee in a cup every month or six weeks to prove their disability status.  (*Id.* (30:6–16).)  Freeburg added, with respect to reasonable accommodation requests, "We'll make it tough."  (*Id.* at 226–27 (36:14–15).)

## 2.     July Meeting: First Reading of the Proposed Procedure

In preparation for the Council's July 16, 2018 meeting, City Planner Clark Palmer sent a memo to the Council, which included a draft text amendment and ordinance to establish the process by which the City would review reasonable accommodation requests by licensed sober houses.  (*Id.* at 250.)  Specifically, the proposed Sober House Licensing Ordinance (the "Ordinance") provided, in part, that:

> (a) [A reasonable accommodation request may be made] on an application form provided by the City . . . [by] any individual with a disability, his or her representative or a developer or provider of housing for an individual with a disability.  The application shall include a detailed explanation of why the modification is reasonably necessary to make the specific housing available to the person(s), including information establishing that the applicant is disabled under applicable

laws, as well as other information required by the City to make the determination.

(b) The City shall review the request and make a recommendation to the City Council.  The request shall be evaluated under the following factors:

1. Whether there is a qualifying disability;

2. Whether the request is needed to allow a disabled person equal opportunity to use and enjoy a dwelling or to live in a particular neighborhood as a person without disabilities;

3. Whether the request is reasonable, considering the potential impact on surrounding uses, the extent to which the accommodation meets the stated need, and other alternatives that may meet that need;

4. Whether the request would constitute a fundamental alteration of the city's regulations, policies, or procedures;

5. Whether the request would impose an undue financial or administrative burden on the City; and

6. Any other factor that may have a bearing on the request, as determined by the City.

(*Id.* at 253, 257.)[2]

Additional amendments were proposed to allow the City to enter a sober house

with an administrative search warrant and to impose a spacing restriction of 1,320 feet (a

---

[2] This language is identical to the Ordinance, as codified.  (*See* LUR at 965, Docket No. 24-2.)

quarter mile) between sober houses that had been granted reasonable accommodations. (*Id.* at 255, 258.)

At the meeting, City Attorney Baumgartner explained that a reasonable accommodation procedure was needed to avoid opening the Council up to arbitrary and capricious challenges—"[an] application in and of itself will afford us an opportunity to see whether [applicants] meet that criteria before you have to make a decision on it." (*Id.* at 279 (11:1–24).) Baumgartner also noted that a decision cannot rest on the simple fact that applicants are not related by blood. (*Id.* at 280 (15:12–16:1).) "[W]e're supposed to be viewing them as a family for all intents and purposes, aside from the fact that they're not all blood related, okay? So if a family can live together and have male, female in there and own two dogs and that's allowed under our ordinance, they could as well." (*Id.* at 280–81 (16:24–17:4).)

Councilmember Freeburg stated that "it was years ago we beat sober home housing to death and I thought we had ordinances in place and rules in place and we had done all this once before." (*Id.* at 284 (32:18–22).) Rice responded, "Well, we did. When we limited four unrelated people, that tackled that issue pretty well for us." (*Id.* at 284 (32:23–25).) Councilmember Weaver then proclaimed that:

> I hope staff runs through every scenario possible which could happen with this 'necessity' as you say . . . because I think our number one job as council people is to protect our neighborhoods . . . dot every I and cross every T as many times as possible to push it right to the edge and maybe hang over a little bit to protect those neighborhoods[.]

(*Id.* at 285 (36:5–15).)

Baumgartner closed by stating that "There's not an easy answer to it. Sometimes we're forced to make decisions and implement things that we don't understand or agree with. Yet the alternative can be much worse. I think this is one of those." (*Id.* at 288 (46:4–8).)

### 3.    August Meeting: Second Reading of the Proposed Procedure

On August 6, 2018, the Council met for the second reading of the proposed amendment. (*Id.* at 359.) After a brief discussion, the Council approved the reasonable accommodation procedure as proposed, (*id.* at 363 (18:16–19:4)), which did not differ from the text considered at the first reading in July.

### D.    One Love's Reasonable Accommodation Request

### 1.    The Application

On September 23, 2018 One Love submitted a request for a reasonable accommodation, asking that seven residents be allowed to occupy its Washington Street property. (*Id.* at 394, 396.) The request also stated that residents would be placed by sober housing placement organizations or referred in from treatment facilities, that each resident would have access to all household facilities and common areas, that residents would share common duties such as cleaning and general maintenance, and that residents would make decisions in a democratic manner, including accepting new residents. (*Id.* at 395.) No drugs or alcohol would be allowed, recovery meetings would

be held at the house for residents only, and residents would have to go through a treatment program and have 30 days of sobriety before arriving at the house.  (*Id.* at 396.)

Regarding the application form's requirement to "provide an explanation of how the proposed accommodation would benefit persons with a disability," (*id.* at 394), One Love stated that recovering from alcoholism or chemical dependence "creates a special need for a strong support group though which individuals can live in an aftercare environment free from pressures and temptations, learning how to deal with cravings and recovering physically, spiritually, and emotionally."  (*Id.* at 398–399.)  It then described the benefit as learning how to apply skills to maintain sobriety in a real-world environment while participating in a strong support group and sober environment.  (*Id.* at 399.)

Regarding "why the accommodation is necessary to meet their particular needs," (*id.* at 394), One Love stated that:

> A successful sober living aftercare program requires two components: (i) a residential community and (ii) a strong support group.  A modification to increase the number of residents permitted to live in a home is necessary to provide a strong support group in a residential environment.  The applicant knows of no alternative that provides similar benefits.

(*Id.* at 399.)  Under additional factors, One Love added that the "residents of the house operate as a family unit in which each resident is responsible for chores and other duties."  (*Id.*)  It also stated that the house is financially self-sustaining and does not receive

-11-

government support, and that each resident would share a bedroom with another person. (*Id.* at 400.)

### 2.      November Meeting: Considering One Love's Request

A public meeting to consider One Love's request was held on November 19, 2018 (*Id.* at 525, Docket No. 24-2.)  Mayor Rice invited public comments, and a next-door neighbor spoke first, stating that the current residents of One Love's sober house had been great and that she was not concerned with the house's capacity almost doubling in size; she was, however, concerned with the maintenance of a nearby streetlight. (*Id.* at 526–27 (8:9–9:22).)    Councilmember Freeburg asked her if she thought an accommodation would "affect the sale of your house," (*id.* at 527 (10:1–3), to which she replied that she did not see that as an issue, (*id.* (10:4–18).)  Her husband agreed that there had been no issues with the current residents, but he thought that if he told his friends that there was a "sober house of seven unrelated people that live there, they probably . . . wouldn't be that excited . . . to live there." (*Id.* (10:19–12:12).)  Another person who lived a couple of houses down was concerned about increasing the size of the household, as it was "50 feet away from the junior high school . . . they might be good people and what not . . . [but] there could be some problems there." (*Id.* at 528 (13:3– 14:3).)  He was also concerned that adding more residents would have a detrimental effect on the value of his house. (*Id.* (14:16–25).)

City Attorney Baumgartner commented that "fears of the public and the community is not necessarily [] criteria that is to be or should be considered when addressing whether or not a request for reasonable accommodation should be granted . . . the council should [not] be saying, well, the community doesn't want it." (*Id.* at 529 (18:23–19:10).) He added that criteria that should be considered was "whether or not the request is disability related and whether the request for the reasonable accommodation satisfies that disability need." (*Id.* (20:1–6).)

As the conversation turned to the question of necessity, Freeburg stated that he did not understand the idea of "cramping [] people into a small house that's going to make them well quicker. It doesn't work for me." (*Id.* at 533 (33:5–7).) Rice added, that "I have heard several times this evening [from neighbors] that it's working just fine there . . . I think that's evidence that four is enough and seven are not necessary." (*Id.* (33:13–24).)

One Love's counsel stood up to clarify One Love's position, stating that:

> The sober house is essentially asking—basically, see this as if a family moved in, a mother, father, five kids, so seven people living in that house . . . That's a family by anybody's definition. And essentially what these people are asking is, treat us as if we're a family. They live together. They share household expenses. They do chores together . . . So essentially then, the reasons why we want to have seven instead of four people . . . well, two reasons . . . [First, case law[3] shows] that between seven and 15 people provide a therapeutic environment for people that are recovering from drug and alcohol addiction. So fewer than seven people, they've shown—and there are

---

[3] During his remarks, One Love's counsel requested that the letter listing this case law, which was first provided to the Council in March 2018, be provided to the Council again, which City Planner Palmer said he would do. (LUR at 538 (54:6–12), Docket No. 24-2.)

studies to back this up . . . has less of a benefit . . . [Y]ou don't form the bonds with people.  You don't have the sort of accountability that you have.  I mean, the whole point of a sober house is that they're watching out for each other.  They're keeping tabs on each other.  They're helping each other out.  They're giving each other rides when they need it.  They're . . . functioning as a family to help each other get back into society.

[. . .]

So that's one of the reasons that they want to have seven people.  The other, and it did come up, is financial viability.  So, you know, this is a business in the sense that they need to be able to make enough to cover their mortgage, expenses, turnover . . . They have to be able to cover empty spots in the houses at times, and other miscellaneous expenses that come up . . . So they want to have seven people in order for the house to be financially self-sustaining, so that it can stand on its own[.]

(*Id.* at 533–34 (35:25–39:7).)  One Love's business and property manager added that all current residents came from one of two treatment centers in Anoka.  (*Id.* at 534 (40:9–18).)

The neighbor from down the street spoke once more, suggesting that housing people in recovery next to schools and a daycare center could lead to a lot of trouble.  (*Id.* at 535 (41:10–42:6).)  Freeburg then stated that "my concern is more for the people who live here and have homes and protecting their home and protecting their values . . . And that's why I'm not in favor of changing this, making that exception for this property.  (*Id.* at 535–36 (44:23–45:6).)  Rice added, "we are reasonable in allowing four unrelated people to live in a home and that more than four is not reasonable."  (*Id.* at 536 (47:13–

48:1).)  Councilmember Wesp averred that "the city proves that four is the appropriate number and shouldn't be changed."  (*Id.* at 537 (51:15–17).)

In concluding the meeting, Rice recommended denial of One Love's reasonable accommodation request and noted agreement by Freeburg and Wesp.  (*Id.* at 539 (59:12–60:2).)  Councilmember Weaver stated that he shared the same opinion.  (*Id.* (60:3–4).)

### 3.    December Meeting: Resolving to Deny One Love's Request

On December 3, 2018, the Council met again.  (*Id.* at 619.)  Councilmember Weaver started off by saying that Councilmember "Freeburg hit a home run" when he "started to talk about property values" at the last meeting—"how would you like to sell your house if you lived next to [One Love] . . . it was very concerning."  (*Id.* at 620 (6:3–9).)  Weaver then stated that he would vote to approve the resolution denying One Love's request. (*Id.* (6:14–15).)  The Council then unanimously voted to approve the resolution denying One Love's request.  (*Id.* (11:17–12:8).)

### 4.    The Resolution

The resolution was adopted on December 3, 2018.  (*Id.* at 618.)  It stated that, "based upon the application submitted by the Applicant and testimony of the Applicant and its attorney," the Council found that "the Applicant has not shown how an increase from 4 to 7 residents is specifically needed to accommodate the need of the disabled." (*Id.* at 617.)  The Council further found that allowing "4 unrelated people to reside at the property . . . as a single family would also include and be applicable to those with a

-15-

disability." (*Id.* at 618.)  And, finally, the Council found that "financial considerations concerning the number of residents needed to maintain the financial viability of the sober house is not a consideration for whether to grant or deny the reasonable accommodation request." (*Id.*)

### 5. Reconsideration

On February 8, 2019, One Love's counsel sent a request for reconsideration, which included a letter citing case law and legislative history and argued that large numbers of residents are necessary for a therapeutic environment, that financial viability is a legitimate consideration in regard to necessity, and that whether an ordinance is generally applicable is irrelevant when considering a reasonable accommodation request. (*Id.* at 635–43.)  The City never responded.

## II.  PROCEDURAL BACKGROUND

Plaintiffs filed this action on May 10, 2019, alleging that the City had discriminated against them in violation of the FHA and ADA.  (Compl. ¶¶ 57–65, May 10, 2019, Docket No. 1).  Plaintiffs ask for declaratory, injunctive, and monetary relief.  (*Id.* at 14–15.)  On January 29, 2021, the parties filed cross-motions for summary judgment with respect to Plaintiffs' claims.  (Def.'s Mot. Summ. J., Jan. 29, 2021, Docket No. 55; Pls.' Mot. Summ. J., Jan. 29, 2021, Docket No. 60.)

### DISCUSSION

I.      **STANDARD OF REVIEW**

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The non-moving party may not rest on mere allegations or denials but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial.  *Anderson*, 477 U.S. at 256 (citing Fed. R. Civ. P. 56(e)).  "The mere existence of a scintilla of evidence in support of the [movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [movant]."  *Id.* at 252.  At the summary judgment stage, the Court will not make credibility determinations or weigh the evidence before it.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

II.     **PRELIMINARY MATTERS**

A.      **Standing**

To satisfy the constitutional minimum of standing, plaintiffs must show they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). At the summary judgment stage, plaintiffs must set forth specific facts by affidavit or other evidence, which will be taken as true for summary judgment. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (citing Fed. R. Civ. P. 56(e)).

Under the FHA, any "aggrieved person" may file a civil action. 42 U.S.C. § 3613(a)(1)(A). The Supreme Court has interpreted "aggrieved person" to extend as broadly as is permitted by Article III of the Constitution. *Bank of America v. City of Miami*, 137 S. Ct. 1296, 1303 (2017). Similarly, under the ADA, anyone who is discriminated against on the basis of their disability, or because of their association with someone with a disability, may bring an action if they are then denied the services, programs, or activities of a public entity. 42 U.S.C. §§ 12132–12133; 28 C.F.R. § 35.130(g) ("A public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association."). The ADA is also broadly construed. *Steger v. Franco, Inc.*, 228 F.3d 889, 894 (8th Cir. 2000).

In one page of briefing, the City attempts to circumvent the broad applicability of these statutes by asserting that One Love is not a disabled person, and that its residents

are not necessarily disabled.  However, when an organization presents evidence that a party's actions have impaired its ability to provide services in its role of facilitating housing, it has standing to sue pursuant to the FHA.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).  Here, One Love has presented evidence amply demonstrating that its ability to provide a stable and supportive sober house has been impaired by the City's denial of its reasonable accommodation request.  Thus, the Court concludes that One Love has standing to assert its FHA claim.

Relatedly, when an organization presents evidence that it was denied a zoning-related request because it attends to or associates with disabled individuals, it has standing to sue pursuant to the ADA.  *See MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 335 (6th Cir. 2002) (citing *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 47 (2d Cir. 1997).  Here, One Love has presented evidence that the City's denial of its reasonable accommodation request flowed from One Love's association with individuals who live in its sober house and are recovering from alcoholism or chemical dependence. The remaining question, then, is whether these individuals are disabled.  They are.

"Alcoholism, like drug addiction, is an 'impairment' under the definitions of a disability set forth in the FHA [and the ADA]."  *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 46 (2d Cir. 2002) (collecting cases).  Further, the evidence indicates that One Love's residents' impairments substantially limit their ability to live independently without relapsing; that most, if not all, of the residents have a record of

impairment given that they seek sober housing only after completing alcoholism or chemical dependence treatment; and, that the City regarded them as having a substantially limiting impairment.  As such, the Court finds that One Love's sober house residents are disabled under both the FHA and ADA.  *See* 42 U.S.C. § 3602(h); *Id.* § 12102(1).  Thus, the Court concludes that the individual Plaintiffs have standing to assert their FHA and ADA claims, as they are such residents, and that One Love has standing to assert its ADA claim based on its association with its residents.

> **B.  Admissibility of Evidence**

The City asserts that the expert report submitted by One Love is not allowed under Eighth Circuit precedent, as courts are only to consider the record before the Council when it made its decision, and that the report is inadmissible because One Love's expert, John Curtiss, is unqualified.[4]

With regard to the first assertion, the City misstates the law.  In fact, in an analogous Eighth Circuit case, the court specifically referenced expert testimony introduced in district court to support its reasoning.  *Oxford House-C v. City of St. Louis*, 77 F.3d 249, 252 (8th Cir. 1996).  Moreover, as a court in this district has noted, while the "Eighth Circuit has not specifically addressed the extent to which the record is limited, if at all," in FHA claims, "other federal courts have specifically held that cases challenging

---

[4] The City also challenges four documents cited to by One Love, arguing that they are hearsay. The Court will not reach this question, as it has no need to consider these documents when deciding the parties' cross-motions.

zoning decisions under the [FHA] may include additional evidence[.]" *Essling's Homes Plus v. City of St. Paul*, 356 F. Supp. 2d 971, 976–77 (D. Minn. 2004).

As to the second assertion, the Court finds that Curtiss is qualified to speak to the benefits of having 7–15 residents in a sober house, both in terms of being able to provide the proper therapeutic support and to achieve financial viability.[5]  Curtiss directed or supervised Hazelden treatment facilities and units for numerous years, was a chemical dependency counselor, created a model of care for people in recovery, is the co-founder of the Minnesota Association of Sober Homes, and his non-profit organization runs six sober houses in St. Paul.[6]  However, the Court will not consider the report's conclusions concerning whether the Council expressed unlawful animosity towards Plaintiffs or whether individual Plaintiffs are disabled,[7] as these matters are the province of either a jury or the Court, not an expert witness.

## III.   ANALYSIS

To establish discrimination under either the FHA or the ADA, Plaintiffs may proceed under any or all of three theories: intentional discrimination (disparate treatment), disparate impact, and failure to make a reasonable accommodation.  *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 573 (2d Cir. 2003); *Reg'l Econ. Cmty. Action Program*, 294 F.3d at 48; *see also Gallagher v. Magner*, 619 F.3d 823, 831 (8th Cir. 2010).  Due to the

---

[5] (*See* Decl. John Curtiss ¶ 1, Ex. 1 ("Curtiss Report") at 7–8, Jan. 29, 2021, Docket No. 64-1.)
[6] (Curtiss Report at 7, 12–13.)
[7] (*Id.* at 3–7, 10–11.)

similarities between the FHA and the ADA, the Court will interpret them as one.  *Accord*

*Tsombanidis*, 352 F.3d at 573 n.4.  Though One Love has asserted all three theories, when

deciding whether summary judgment is appropriate, the Court will only consider one:

whether the City failed to make a reasonable accommodation.[8]

### A.      Reasonable Accommodation

Under the FHA, it is a discriminatory housing practice to refuse to make

"reasonable accommodations in rules, policies, practices, or services when such

accommodations may be necessary to afford such person equal opportunity to use and

enjoy a dwelling[.]"  42 U.S.C. § 3604(f)(3)(B).  "Under this provision, affirmative steps are

required to change rules or practices if they are necessary to allow a person with a

disability an opportunity to live in the community[.]"  *Horizon House Developmental*

*Servs., Inc. v. Twp. of Upper Southampton*, 804 F. Supp. 683, 699 (E.D. Pa. 1992), *aff'd*, 995

F.2d 217 (3d Cir. 1993); *see also Peebles v. Potter*, 354 F.3d 761, 767 (8th Cir. 2004) ("In a

reasonable accommodation case, the 'discrimination' is framed in terms of the failure to

fulfill an affirmative duty[.]").  If necessary, changes must be made to traditional rules or

---

[8] Regarding whether various provisions in the Ordinance are facially discriminatory, this is likely, especially the spacing requirement, but none are at issue here.  Therefore, the Court will not decide this question.  With respect to the question of disparate treatment, the Court finds that specific facts exist that create a genuine issue for trial, especially whether discriminatory intent motivated the Council's decision or was masked by pretext.  The Court also finds that a genuine issue of material fact surrounds the question of disparate impact, namely whether there was a viable alternative means to achieve the City's zoning scheme without having discriminatory effects on sober houses.  In sum, deciding Plaintiffs' claims under either a theory of intentional discrimination or disparate impact would be inappropriate at the summary judgment stage.

practices to permit disabled persons an equal opportunity to use and enjoy a dwelling. H.R. Rep. 100-711, at 25 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2186.

First, however, plaintiffs bear the burden to show that the accommodation they seek is reasonable on its face, after which the defendant must then come forward to demonstrate unreasonableness*. Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 783 (7th Cir. 2002) (citing *US Airways, Inc. v. Barnett*, 535 U.S. 391, 401–02 (2002)); *see also Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 950 (8th Cir. 1999).  Plaintiffs also bear the burden to make a facial showing that the requested accommodation is necessary to afford disabled persons an equal opportunity to use and enjoy a dwelling, after which the burden shifts to the defendant to show that the requested accommodation is unreasonable.  *Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of Twp. of Scotch Plains*, 284 F.3d 442, 457 (3d Cir. 2002).  An accommodation is unreasonable if "it imposes undue financial or administrative burdens or requires a fundamental alteration in the nature of the program."  *Oconomowoc*, 300 F.3d at 784.

In sum, if plaintiffs demonstrate that the requested accommodation is both reasonable and necessary, and the defendant fails to demonstrate that it is unreasonable, then the defendant has an affirmative duty to grant the accommodation, as a matter of law.

### 1.      Reasonableness

A requested accommodation is reasonable on its face if it is ordinary or in the run of cases.  *Peebles*, 354 F.3d at 768 (quoting *Barnett*, 535 U.S. 391 at 401).  A request by disabled persons to exceed the number of unrelated people permitted in order to live in a single family-zoned house of their choice is ordinary and in the run of cases, *see Brandt v. Village of Chebanse*, 82 F.3d 172, 174 (7th Cir. 1996); *Essling's*, 356 F. Supp. 2d at 980, and One Love's requested accommodation is no different.

Furthermore, an accommodation is reasonable if it is "both efficacious and proportional to the costs to implement it."  *Oconomowoc*, 300 F.3d at 784.  Here, the requested accommodation involves having three additional residents occupy a four-bedroom house, one with ample room and considerable off-street parking.  As such, there will be no cost to the City to implement it.  Nor will three additional residents fundamentally alter the nature of the single-family neighborhood in which the dwelling sits.  *Accord Smith & Lee Assocs., Inc. v. City of Taylor*, 102 F.3d 781, 796 (6th Cir. 1996)*.* Thus, the Court concludes that One Love has met its burden to demonstrate that the requested accommodation is reasonable.

On the other hand, the City presents no evidence to demonstrate that the Council, at the time of its decision, thought that One Love's requested accommodation would impose an undue financial or administrative burden upon the City or fundamentally alter its zoning scheme; in fact, these issues were never raised during meetings, nor were they

listed as findings in the Council's resolution denying One Love's request.  Instead, the Council articulated generalized conceptions about people in recovery and the perceived threat such people pose to property values and public safety.  However, neither is a legitimate ground upon which to rest an assertion of unreasonableness.  Thus, the City has failed to meet its burden.

The Court therefore concludes that there is no genuine issue of material fact regarding whether One Love's requested accommodation is reasonable.

### 2.    Necessity

Whether an accommodation is necessary requires a showing that it "will affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability." *Oconomowoc*, 300 F.3d at 784 (quotation omitted).  In other words, plaintiffs must show that they will be denied an equal opportunity to live together in a family setting without the required accommodation.  *Id.* at 784–85.  Oftentimes, an accommodation is necessary to provide an appropriate level of support, for financial reasons, or both, *id.*, and some minimum size may be essential for the family venture to be a success, *Brandt,* 82 F.3d at 174.

Here, One Love worked to meet its burden in three ways.  First, One Love provided a letter to the Council, which stated that increasing One Love's household beyond four recovering persons was necessary to enable its residents to provide each other with continual mutual support and monitoring to prevent relapse, and that it is critical that

persons in the early and middle stages of recovery share a bedroom with another for such support and monitoring.  Next, in its reasonable accommodation request application, One Love echoed the letter, stating that a successful sober living residential community requires a strong support group, and that a modification to increase the number of residents permitted to live in the sober house was necessary to form such a support group.  Lastly, at the November 2018 meeting, One Love's counsel demonstrated, at length, that at least seven residents were required to generate the necessary therapeutic environment for people in recovery and to make the sober house financially viable and therefore succeed.

The Court finds that the letter, application, and public remarks demonstrate that One Love's requested accommodation—adding three more residents—is necessary. First, it will affirmatively enhance its residents' quality of life by ameliorating the effects of their disability.  Sharing a bedroom with another is of utmost importance for an individual in a sober house, as it enables residents to hold each other accountable and ward off substantial impediments to a successful recovery, namely loneliness and isolation.  Additionally, success in recovery requires a certain critical mass to achieve the necessary level of familial love and therapeutic support, which One Love stated requires 7–15 residents, a range which Curtiss's report supports.[9]  Finally, One Love demonstrated

---

[9] (Curtiss Report at 7 (stating that most if not all sober houses aligned with the Minnesota Association of Sober Homes have six to fifteen residents to create the proper therapeutic milieu).)  It is also worth noting that One Love's requested accommodation was for six renting residents plus one house manager.

that having three additional residents is necessary to achieve financial viability, as only then can the sober house generate enough income to survive, which other evidence in the record firmly supports.[10]  As such, the Court concludes that One Love has met its burden in regard to the necessity of the requested accommodation.

Once again, however, the City presents no evidence to demonstrate that the Council thought that One Love's requested accommodation would impose an undue financial or administrative burden upon the City or fundamentally alter its zoning scheme. Instead, the Council focused on fears regarding property values and public safety, not the unreasonableness of the requested accommodation; relied on comments made by neighbors and councilmembers' personal feelings, not One Love's submissions and remarks, to find that having more than four residents was unnecessary to promote effective therapy; and, found that no accommodation was necessary because One Love was being treated the same as a non-disabled family of four unrelated individuals, even though any accommodation necessarily entails being treated differently.  Additionally, the Council refused to consider the question of financial viability, even though courts routinely recognize this as a valid FHA consideration.[11]  Thus, the City has not met its burden.

---

[10] (Schwie Decl. ¶ 2, Ex. B at 67–76, Jan. 29, 2021, Docket No. 57-1 (documenting yearly expenses in excess of what the house could generate in income with only three renting residents).)

[11] *See, e.g., Oconomowoc*, 300 F.3d at 784; *Smith & Lee*, 102 F.3d at 796; *King's Ranch of Jonesboro, Inc. v. City of Jonesboro*, No. 10-0096, 2011 WL 1544697, at *5 (E.D. Ark. Apr. 25, 2011); *Jeffrey O. v. City of Boca Raton*, 511 F. Supp. 2d 1339, 1356 (S.D. Fla. 2007); *Dr. Gertrude*
*(footnote continued on next page)*

The Court therefore concludes that there is no genuine issue of material fact regarding whether One Love's requested accommodation is necessary.

## CONCLUSION

In sum, the Court concludes that One Love has met its burden to demonstrate that the requested accommodation is both reasonable and necessary to afford recovering persons an equal opportunity to use and enjoy One Love's Washington Street dwelling, and that the City has not met its burden to demonstrate that the accommodation is unreasonable.  Thus, as a matter of law, the City has an affirmative duty to grant One Love's requested accommodation to increase the number of permitted residents from four to seven at the dwelling.  Accordingly, the Court will grant Plaintiffs' Motion for Summary Judgment and deny the City's Motion for Summary Judgment.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.   Defendant's Motion for Summary Judgment [Docket No. 55] is **DENIED**;

---

*A. Barber Ctr., Inc. v. Peters Twp.*, 273 F. Supp. 2d 643, 652 (W.D. Pa. 2003) ("A provider of housing for the handicapped may establish the necessity of a requested accommodation through evidence that it must maintain a certain minimum level of occupancy for its own financial viability.").

2. Plaintiffs' Motion for Summary Judgment [Docket No. 60] is **GRANTED** with the

issue of damages to be decided at trial.

**IT IS FURTHER ORDERED** that the City of Anoka shall grant One Love's reasonable

accommodation request to house seven residents at its dwelling at 328 Washington

Street.

DATED:  August 25, 2021
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
Chief Judge
United States District Court